IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHRISTINA SCHREINER,

                  Plaintiff,

      v.

UNITED WISCONSIN INSURANCE COMPANY
d/b/a UNITED WISCONSIN GROUP,

                  Defendant.

OPINION AND ORDER

08-cv-532-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This is a civil action brought under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461.  Plaintiff Christina Schreiner contends that defendant United Wisconsin Insurance Company d/b/a United Wisconsin Group violated ERISA by terminating her long term disability benefits under her employer's welfare benefit plan.  Jurisdiction is present.  28 U.S.C. § 1331.

      Before the court are the parties' cross motions for summary judgment.  Dkts. ## 14 & 22.  The parties agree that defendant's decision to deny benefits will stand unless plaintiff can show that it is arbitrary or capricious.  Thus, the question is whether it was arbitrary or capricious of defendant to terminate plaintiff's long term disability benefits.  To obtain such

benefits, plaintiff had to show that she was unable to "perform any of the material duties of any gainful occupation" for which she is reasonably fitted.  One of plaintiff's two treating physicians considered her unable to work at any job; the other thought she could work at sedentary jobs other than the one she had.  Neither doctor referred to any objective medical findings to support his opinion.  Defendant provided plaintiff a functional capacity evaluation by an independent agency and had her medical files reviewed by two medical specialists.  Neither the functional capacity evaluation nor the chart reviews supported a finding that plaintiff could not perform light or sedentary work activity.  I conclude from this evidence that plaintiff has failed to meet her burden of showing that defendant's termination of disability benefits was arbitrary or capricious.  I conclude also that plaintiff received a full and fair review of the termination and that defendant gave her the information she needed to prepare an appeal of the adverse decision.  Accordingly, plaintiff's motion for summary judgment will be denied and defendant's will be granted.

From the parties' proposed findings of fact and the administrative record, I find the following facts to be undisputed.

## UNDISPUTED FACTS

### A.  Plaintiff's Employer's Group Insurance Policy

In March 2000, plaintiff Christina Schreiner began working for Luther Midelfort

Mayo Health System as a receptionist.  Plaintiff's regular occupation as a receptionist is a sedentary occupation listed by her employer as requiring occasional walking and standing, that is, 1% to 33% of the time, and continuous or constant sitting, talking or hearing and using her hands, that is, 67% to 100% of the time.  Plaintiff participated in her employer's employee welfare benefit plan, which provided long term disability coverage.  The plan's benefits are underwritten and insured by defendant United Wisconsin.  As the insurer of the plan, defendant pays for claims filed by Luther Midelfort's employees.  Defendant is also the plan administrator.  According to the plan,

> [Defendant] shall have full and final discretionary authority in disputes concerning Benefits and the exclusive power and duty to conclusively construe and interpret the terms of this policy. [Defendant] shall determine all questions of coverage and eligibility for the Benefits under the policy. [Defendant's] decisions shall be binding.

Administrative Record (AR), dkt. #18, at 22.

The plan includes the following definitions:

"TOTAL DISABILITY" and "TOTALLY DISABLED" means that due to Injury or Illness:

1. the Insured cannot perform the material duties of his or her regular occupation during the Elimination Period and the following 24 months of the Benefit Period; and

2. after 24 months of the Benefit Period, the Insured cannot perform any of the material duties of any gainful occupation for which he/she is or may be reasonably fitted by education, training or experience.

"PARTIAL DISABILITY" and "PARTIALLY DISABLED" means that due to Injury

3

and/or Illness, the Insured is unable to earn 80% of his or her monthly Indexed Pre-Disability Earnings because of that Injury or Illness and is either:

1. during the Elimination Period and the first 24 months of the Benefit Period, unable to perform all material duties of his or her regular occupation on a Full-Time basis, but is performing at least one of the material duties of his or her regular occupation or another occupation on a part-time or Full-Time basis; or

2. after the first 24 months of the Benefit Period, unable to perform the material duties of any occupation for which he or she is or may be reasonably fitted by education, training or experience.

When Totally or Partially Disabled based on objective medical findings, the Insured must be under the Regular Care and Treatment of a Physician and provide documentation of same as required by [defendant].  The Insured may be required to see a Physician selected by [defendant] for an Independent medical examination.

AR at 21.

## B.  Plaintiff's Claim for Long Term Disability Benefits

### 1.  Plaintiff's back surgery

Plaintiff began having back problems after a motor vehicle accident in October 2002. In the fall of 2004, a doctor diagnosed her condition as "segmental instability with internal disk derangement L4-5 [and] symptomatic isthmic spondylolisthsis L5-S1." AR at 328.  In October 2004, after plaintiff and her treating doctors decided that back surgery was the best option to treat her back pain, she underwent reconstructive spine surgery.  The surgery involved a laminectomy, which is the removal of the lamina of a vertebra, and included an

4

L4 through S1 fusion and insertion of screws and interconnecting rods.  Dr. James Manz, a board certified specialist in orthopedics, conducted plaintiff's surgery and was plaintiff's treating physician after the surgery.

2.  Plaintiff's first year of recovery and initial receipt of long term disability benefits

a.  January through April 2005

On January 28, 2005, plaintiff submitted a claim to defendant for long term disability benefits under Luther Midelfort's group insurance policy.  She noted that she expected to return to work on February 1, 2005 and begin working about 2 hours a day.  On March 4, 2005, defendant received Dr. Manz's "Attending Physician's Statement" regarding plaintiff's disability claim, in which he noted that plaintiff could return to her regular occupation on January 31, 2005 with several limitations, including having to change positions every 15 minutes.  Attached to the statement were notes about plaintiff's recovery since the surgery. With respect to the results of her surgery, Manz stated

> Radiographically, I do not see any overt signs of change or failure to her implant and her fusion is setting up appropriately.

AR at 330.

With Dr. Manz's approval, plaintiff began increasing her work hours almost immediately after returning to work.  By the end of February she was working three four-

5

hour days and two six-hour days a week.

On March 21, 2005, defendant approved plaintiff's claim for long term disability benefits to begin retroactively from January 25, 2005.  In the approval letter, defendant said, "We require periodic medical updates to assess your disability status and will notify you when these are due."  AR at 306.  Because plaintiff was working part time, defendant required monthly verification of plaintiff's hours worked and her monthly income in order to calculate her monthly partial disability benefits.

In March 2005, plaintiff received a "Continuance of Disability" form.  In accordance with the form, plaintiff filled out the "Statement of Insured" and had Dr. Manz fill out the "Attending Physician Statement."  Dr. Manz noted that plaintiff was not totally disabled but that she was unable to work full time.  In his statement, he referred to the notes from plaintiff's April 1, 2005 followup appointment, which stated in relevant part:

> She thinks she is making progress.  She is denying any significant leg symptoms, the back is still sore but slowly getting better.  She has also returned to work a little sooner than what we had suggested.  She is at 52 hours every pay period.  She is doing three four-hour day shifts, one six hour day and one eight hour day.  She thinks the eight hour day may be a little too much right now and is considering backing off on that.  She is sleeping okay, walking a mile and a half a day. . . .

> PHYSICAL EXAMINATION: On examination today she is strong in all major muscle groups of the lower extremities and feet bilaterally.  Sensory examination to touch is normal and equal in all dermatomes of the lower extremities and feet.  Straight-leg raising to 90 degrees is done with some tightness in the back but no real pain.  Neurologically she is intact.

6

> RADIOGRAPHIC REVIEW: Plain x-rays taken today reviewed by Dr. Manz shows no overt signs of change or failure of her implant.  The fusion bone is setting up nicely.  It is not totally visible due to the overlie of the implant.  The adjacent disc interspaces are stable.
>
> . . . .
>
> We discussed dropping down one of her days to another six hour day to see how that goes before starting to increase hours again.

AR at 285-86.  A more detailed statement on plaintiff's x-ray stated that "[t]here is no appreciable change in alignment when compared to 25 January 2005.  There is no evidence of loosening of hardware.  Again noted is disk space narrowing at L4-5.  No other significant abnormality or change is seen." AR at 287.  For the month of April, plaintiff did not receive any disability benefit payments because her gross earnings exceeded 80% of her pre-disability earnings for that month.


b.  May through August 2005

On May 16, 2005, plaintiff called Dr. Manz's office to report that since she began attempting to work 40 hours a week she had been suffering more left-sided back and upper leg pain and that the pain had forced her to leave work early that day.  Without examining plaintiff, the nurse recommended that plaintiff remain home for the remainder of that day, that she not work May 17 or 18 and that upon returning to work on May 19, she resume working 32 hours a week.

On June 17, 2005, plaintiff had a scheduled appointment with Dr. Manz.  At the appointment, Dr. Manz noted that

> She returned to work sooner than was suggested.  She was doing 4-hour day shifts, one 6-hour day, and one 8-hour day, and then she jumped to a full 40 hours a week. After that she had increasing back, left buttock, and thigh pain sometimes with numbness in the foot.  When we saw her in April we dropped her down in her hours. That helped, and later in April she was trying again to increase work hours.  She sits all day in reception in Internal Medicine Department her at Midelfort Clinic. . . .  She states it is still difficult for her.  She does pretty well for the first two 8-hour days but then by the third day she has increasing problems.  When she rests and is ready to come back to work, the back and leg feel better.

AR at 562.  On July 19, 2005, plaintiff called Dr. Manz's office to request permission to occasionally work more than two eight-hour days in succession because she wanted to be able to trade shifts rather than take time off.  Dr. Manz granted plaintiff's request but told her not to exceed more than 32 hours in one work week.  Plaintiff did not exceed 80% of her pre-disability earnings or work schedule in May, June, July and August and she received disability benefit payments for those months.

In the August 2005 letter informing plaintiff of the disability benefit payments she would receive for the past month, defendant included another "Continuance of Disability" form.  In the "Attending Physician Statement," Dr. Manz noted that plaintiff was not totally disabled but remained unable to work full time.  He noted the same work limitations he had noted in January 2005.  He added that plaintiff's condition had improved and that she was ambulatory.  He also noted that plaintiff had a class 4 physical impairment, which is defined

8

as a "[m]oderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity.  (60-70%)."  AR at 262.

c.  September through December 2005

Plaintiff did not receive any disability benefit payments for September because her gross earnings exceeded 80% of her pre-disability earnings for the month.  Defendant also informed plaintiff that in September she had worked more hours than the 80% of her pre-disability work hours she could work and still receive benefits.  After that, plaintiff did not exceed 80% of her pre-disability earnings or hours worked in October, November or December and she received disability benefit payments for those months.

On October 21, 2005, almost a year after the surgery, plaintiff had a followup appointment with Dr. Manz.  The appointment notes state that plaintiff had been having some achiness in the lower right side of her back and that a fall a month earlier "stirred up her back pain."  AR at 554.  Dr. Manz added that

> She localizes the pain in the lower lumbar region but particularly on the right side over the posterior iliac crest which would be adjacent to where her bone graft was harvested.  She is tender on deep palpation there.  She does not have significant radicular-type complaints today.
>
> Neurologically, she remains intact in all muscle groups in the lower extremities. . . .
>
> RADIOGRAPHIC REVIEW: Plain films were reviewed.  I do not see any overt signs of change or failure of her implant. . . .  It is indeterminate by my interpretation of

9

her films as to whether she has a solid fusion or not.  We discussed that.

ASSESSMENT AND PLAN: Status post reconstructive spinal surgery at L4-S1 with low back pain, right-sided and particularly of the right iliac graft harvest region.

I believe that she has at least some component to graft site discomfort. . . .  I cannot totally rule out the possibility that she does not have a solid fusion, although there are no overt findings of significant implant failure at this point. . . . [I]t is an option that she consider, although she is not solidly healed presently, [sic] and that one would need to be prepared to add further grafting instrumentation at the time of removal if that was found. . . .  In the interim, I would like to see her up for physical therapy with deep heat, ultrasound, and perhaps massage over the right iliac crest harvest site.  They can also implement passive modalities as needed.

AR at 554.


3.  Plaintiff's second year of recovery and receipt of long term disability benefits

a.  January through April 2006

In January 2006, plaintiff received another "Continuance of Disability" form.  In the "Statement of Insured," plaintiff listed her daily activities as follows: "I get up take a shower get dressed and go to work by the end of the day I am in pain and don't do much of anything."  AR at 195.  In the "Attending Physician Statement," Dr. Manz changed plaintiff's status to totally disabled from her current job and noted that he did not expect a fundamental or marked change in her condition in the future, but she could perform limited work.  Also, although he found plaintiff incapable of sitting all day, he said that she was capable of sedentary clerical work.  He referred to his appointment notes from plaintiff's

10

January 27, 2006 appointment in response to most of the questionnaire. The appointment

notes state the following:

> From a symptom standpoint she has not had any substantive improvement, in fact it is perhaps somewhat worse particularly with her work hours. Great efforts have been made to try to slowly ramp up her work hours and she has done this with due diligence. However, with the increasing hours she has had progressive difficulties with increased back and pseudoradicular pain. Her job requires her to do a lot of protracted sitting, and unfortunately despite major reconstructive surgery the symptoms that were significant in limiting her at work preoperatively continue to be a problem for her post procedure.
>
> PHYSICAL EXAMINATION: Neurologically remains intact in all muscle groups in both lower extremities.
>
> RADIOGRAPHIC REVIEW: Plain films again demonstrate her implant without any overt signs of change or failure as best I can tell and I have reviewed that with her. Her fusion mass continues to be difficult to assess particularly at L4-5. There does appear to be some bridging bone at the lumbosacral level but again it is obscured by the implant and I have discussed with her that there is a possibility she has a pseudoarthrosis although there are no findings that are consistent with loosening or failure. The adjacent disc interspaces do not show significant change.
>
> ASSESSMENT AND PLAN: Status post reconstructive spinal surgery L4-S1 with continued back and leg symptoms. There is no obvious pathology that is amenable to surgical intervention presently. It appears as though the demands imposed by her current job and what her spine can do comfortably are at an impasse. I believe she would benefit from part time work and she is going to explore that as an option.

AR 197-98. The more specific notes on plaintiff's x-rays stated in part: "Mild degenerative

changes at L3-4 interspace. No radiographic evidence of hardware loosening. No change

since 10/21/2005." AR at 199.

Plaintiff received disability benefit payments in January and February. Plaintiff did

11

not receive disability benefit payments for March because she had worked enough hours to receive gross earnings exceeding 80% of her pre-disability earnings for pay periods in March. Plaintiff received disability benefit payments for April.

b.  May through August 2006

On June 8, 2006, plaintiff went to see Dr. Manz because she was having increasing problems with "low back and bilateral thigh pain." AR at 507.  In the medical notes from the appointment, Manz stated in part:

> She was seen here in January of 2006, roughly 15 months from her reconstructive surgery.  She really had not noted any improvement at that time and thought she was somewhat worse after increasing her work hours.  We had tried to ramp her up very slowly, when she went ahead too quickly, we would bring her back down to less hours, but she still had struggled.  Job requires a lot of protracted sitting and unfortunately the type of surgery that she has had on her back, it does affect her sitting tolerance. [We] decreased her work hours in January from 32 hours a week down to 25 hours a week.  Initially this seemed to help some. . . .  She is very concerned about the prolonged sitting and is just unsure that she is going to be able to continue even with limited hours.  An appointment was set up with Dr. Hebl at Health Works for help in sorting out her demands at work. . . . no obvious pathology that is amenable to surgical intervention.  He recommended looking at what she is doing at work, what her spine can do comfortably and suggested a formal evaluation through Health Works to assess part-time work ability. . . .
>
> On examination today, she is sore to palpate over the lumber spine mostly at L4-5, L5-S1 facet joints bilaterally. . . .  Her range of motion is limited in all directions because of increasing back pain.
>
> ASSESSMENT: Status post reconstructive spine surgery L4-S1 with continued back and bilateral leg symptoms. . . .  She is scheduled at Health Works, Dr. Hebl, for

12

evaluation of work ability.  In the meantime, I am taking her off of work until that evaluation can be completed.

AR at 507-08.

On June 16, 2006, plaintiff went to see Dr. Joseph Hebl, an occupational health physician, for an evaluation of her ability to return to work because of her back pain.  Dr. Hebl created a consultation report, in which he stated in part:

SUBJECTIVE: . . . Postoperatively, the patient has not done very well and reports to me today that her symptoms now are worse than they were before surgery.  The patient has made a very valiant effort to try to return to work, but has been decreasing her hours over time because of severe back pain and radiculopathy.  She has tried all of the other modalities to get pain relief including therapy, medications, and injections.  Nothing seems to help her condition.

In the patient's pain diagram, she outlines the mid and low back areas as being an area of burning pain with pins-and-needles and stabbing pain.  The pain radiates down both legs.

PAIN LEVEL: 6-8/10

The following activities make her symptoms worse: Sitting more than anything, exercise, after exercise, bending, coughing, standing, sneezing, lifting, or walking.

OBJECTIVE: . . . Back examination reveals tenderness across the lower lumbar spine into the buttock with difficulty with range of motion of her back in any plane.  She has 30 degrees of forward flexion with pain, 20 degrees of extension, and 20 degrees of right and left lateral flexion and rotation; all with pain.  Lower extremity examination reveals normal strength, reflexes, and neurovascular function with a negative straight leg raise times two. . . .

ASSESSMENT: Chronic severe low back pain in patient status post failed back reconstruction with chronic bilateral lower extremity radiculopathy and back weakness.

13

PLAN: It is my opinion, based on the review of the medical records and my examination of the patient today, that she is unable to return to gainful employment as defined by Social Security Disability regulations and guidelines. I would recommend she apply for Social Security Disability and that she apply for long term disability at work. I doubt that this patient would be a candidate for further reconstructive surgery, as prior reconstructive surgery has not been helpful, nor has any other modality such as therapy, medications, or Pain Clinic injections been helpful.

AR at 135-37. In reaching his opinion that plaintiff suffered from failed back surgery or post-laminectomy syndrome Dr. Hebl "refers to symptoms not relieved by back surgery or that recur after surgery." AR at 118.

On June 20, 2006, plaintiff quit her job on Hebl's recommendation. She received disability benefit payments in both May and June, but stopped working in June, which meant a change in status under her employer's insurance policy from partially disabled to totally disabled.

On July 11, 2006, defendant informed plaintiff that it was reviewing her Long Term Disability claim and that it needed several forms from her to determine whether she remained eligible to obtain benefits. On her "Activities of Daily Living" form, plaintiff noted that she "had pain" if she sat for more than an hour and that she was taking hydrocodone three times a day every day. On the "Attending Physician's Statement," Dr. Hebl referred to the notes from plaintiff's June 16 appointment with him in response to many of the questions, but he did note on the form that plaintiff had post-laminectomy syndrome and

14

that she could never return to work.  On August 23, 2006, defendant approved continuing Long Term Disability benefits for plaintiff.

c.  September through December 2006

On October 26, 2006, defendant informed plaintiff that it was reviewing her claim to determine whether she remained eligible to receive Long Term Disability benefits.  On December 4, 2006, defendant told her that it was continuing to review her claim and had not received her attending physician statement or medical records.

C.  Denial of Plaintiff's Claim for Long Term Disability Benefits

1.  The decision to have plaintiff undergo a functional capacity evaluation

Plaintiff's initial 24-month benefits period was to expire on January 25, 2007.  On January 2, 2007, defendant referred plaintiff's file to its clinical department to determine whether a functional capacity evaluation would be appropriate.  On January 5, 2007, after reviewing plaintiff's medical submissions to date, a nurse in defendant's clinical department determined that a functional capacity evaluation would be appropriate and noted that "if [plaintiff] remains unable to work after FCE completed, objective documentation about functional limitations other than notation of pain might be garnered."  AR at 115.

On January 16, 2007, defendant received Dr. Hebl's "Attending Physician Statement"

15

and some of plaintiff's recent medical records, including Hebl's notes from plaintiff's June 16, 2006 appointment. Hebl based most of his questionnaire responses on plaintiff's June 16 appointment. He noted on the form that plaintiff was unable to work and that she would never be able to return to her occupation or any other work. On January 17, 2007, defendant asked Hebl for authorization for plaintiff to attend and participate in a functional capacity examination. On February 2, 2007, defendants received Dr. Hebl's signed authorization.

2. The functional capacity evaluation

On March 22 and 23, 2007, plaintiff underwent a functional capacity evaluation administered by Jean S. Glanzman, an occupational therapist, at Partners in Health, Sacred Heart Hospital. The evaluation used by Glanzman was created by ErgoScience. Each day's evaluation lasted 3 hours and 25 minutes.

The evaluation results showed that the findings from the two-day tests were relatively consistent; however, one inconsistency was that plaintiff's overall uniformity of effort improved from "significant evidence" of low effort and inconsistent behavior to "very weak evidence." AR at 74. The evaluator noted that plaintiff exhibited self-limiting behavior in more than 33% of the testing, which exceeded normal limits. AR at 74. The evaluation materials define self-limiting behavior as stopping a task before objective signs indicate that

16

a maximum physical effort has been reached.  AR at 82.  Self-limiting behavior may be caused by pain, psychosocial issues, such as fear of re-injury or anxiety, and attempts to manipulate test results.  AR at 76.  Plaintiff's self-limiting behavior was labeled as "significantly exceeding normal limits" because "motivated clients self-limit on no more than 20% of test items" and "[i]f self-limiting exceeds 20%, then psychosocial and/or motivational factors are affecting testing results."  AR at 76 & 88.  Plaintiff was noted as having engaged in self-limiting on 35% of the 20 tasks the first day and 40% of the 20 tasks the second day.  AR at 76.  When engaging in self-limiting behavior, plaintiff provided some of the following explanations: "Pain," "It hurts, it's pulling," "Severe pain," "It hurts too much," and "I have to stop, I'm getting shooting pains down my leg."  AR at 77 & 89.

The evaluator stated that plaintiff's "[p]ain or pain behaviors were inconsistent with the observed deviations on the following tasks: . . . 09-Sitting Tolerance . . . ."  AR at 77 & 89.  However, the evaluator also stated that "[o]n several occasion during mobility and endurance testing, client put her right or left hand to the same side of her low back.  These pain behaviors were consistent with the observed movement patterns."  AR at 77.  In evaluating the sitting tolerance task the first day, the evaluator noted that plaintiff provided the full physical effort and that in the course of sitting for 5 minutes she adjusted her position once and expressed a pain score of 5.50 out of 10 with the pain in her low back and shoulders.  In performing the sitting tolerance task the second day, plaintiff provided the full

17

physical effort, adjusted her position twice during the 5 minute task and expressed a pain score of 5.50 out of 10, with the pain coming from her low back.

The functional capacity evaluation tested plaintiff in many ways, including dynamic strength, position tolerance and mobility tasks.  The evaluator conlcuded that plaintiff could tolerate a "light" level of work during an eight hour work day and a job consisting of "light" work when, among other things, "it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls[.]"  AR at 76.  For both days, the evaluator noted that plaintiff could tolerate sitting for "1/3 to 2/3 of the day."  AR at 79 & 91.  Further, she found that plaintiff's tolerance of a light level of work for an 8-hour work day during a 40-hour work week "was significantly influenced by the client's self-limiting behavior and indicates her minimal rather than her maximal ability."  AR at 76 & 88.

3.  Denial letter

On March 30, 2007, defendant wrote plaintiff to tell her that her benefits would be terminated because she was not prevented from performing her previous occupation, which meant that she was not totally disabled under the group insurance policy.  The letter provided a very brief summary of plaintiff back injury, surgery and recovery.  Then it stated:

> On March 22, 2007 and March 23, 2007 you attended a Functional Capacity Evaluation.  The Functional Capacity Evaluation indicated that you have light work capacity defined by the Department of Occupational Titles, and you are able to

18

perform a light occupation for an 8 hour day.  The test also notes that the tolerance of an 8 hour day was significantly influenced by your self-limiting and inconsistent behavior and indicates your minimal, rather than your maximum ability.

Your previous occupation with Luther Midelfort Hospital was a receptionist, which is a sedentary occupation.

The current information indicates you are able to work at your own occupation.  Base upon this information you no longer meet the definition of being unable to perform your own occupation or any occupation.

AR at 481.  In the letter, defendant's representative quoted the portion of the group insurance policy that discussed total and partial disability, explained that plaintiff could appeal defendant's decision and said, "If you have any other medical information, not previously submitted, which objectively supports your disability, you may submit it for further consideration."  AR at 482.

### D.  Plaintiff's Appeal

On May 18, 2007, plaintiff wrote defendant, appealing the termination of her long term disability benefits.  On June 8, 2007, defendant acknowledged the appeal and informed plaintiff that it had requested further medical documentation from both Dr. Manz and Dr. Hebl, including medical records, office notes, reports, letters, summaries and the results of any diagnostic testing.  On June 23, 2007, plaintiff wrote defendant again and included her medical records dating back to October 2004.  Plaintiff had gone through and highlighted

19

and added notes on portions of her medical records that she believed contradicted the functional capacity examination and supported her long term disability claim.

On July 20, 2007, defendant referred plaintiff's medical documentation to two physicians, Dr. Bhupendra Gupta, a board certified occupational medicine physician, and Dr. Robert Pick, a board certified orthopedic surgeon, for their review.  Dr. Gupta reached the following conclusions:

> [T]he objective medical findings do not support the claimant's assertion that she is unable to perform the physical demands of her own occupation.  The claimant works as a receptionist which is a sedentary job.  The Functional Capacity Evaluation done by Ergo Science is a valid study.  I concur with their data collection method, and overall analysis.  I concur that Ms. Christina Schreiner is capable of sustaining the sedentary/light level duty work for an eight hour workday.
>
> . . . .
>
> Her doctors basically gave her time off and limited her capabilities based on her narrative description of pain. . . .
>
> . . . .
>
> Ms. Christina was restricted during FCE by psychosocial limitation.  It is my belief and determination that if Ms. Christina Schreiner had not exhibited self limiting behavior, she probably would have exceeded to a higher work capacity.
>
> . . . .
>
> Yes, the claimant reached maximum medical improvement
>
> . . . .
>
> On review of the record, there is no evidence to indicate any functional impairment

20

that would prevent Ms. Christina Schreiner from doing sedentary/light level duty work.

AR at 411-12.

On September 10, 2007, plaintiff had an appointment with Dr. Hebl.  Plaintiff submitted the notes from the appointment to defendant in support of her appeal.  In the notes, Hebl stated in part:

> Postoperatively, the patient did not do well and, in fact, reports that she is in more pain now than she was prior to surgery. . . .
>
> The patient was seen June 16, 2006, by me and at that time I recommended that she apply for Social Security Disability.  Apparently the patient was then seen by somebody at Sacred Heart Hospital who felt that she could return to work. . . .  It has been my contention, along with Dr. Manz, her treating back surgeon, that she is unable to return to gainful employment. . . .  She would be an unreliable employee inasmuch as she would not have a predictable back.  Most days she would not be able to function at all because of her back symptoms.  On good days she would probably be able to work two hours of sedentary work.  Anything more than sedentary work would aggravate her back condition, so I would strongly recommend against it.
>
> She did have some sort of functional testing at Sacred Heart Hospital and was told she could return to work, but after that testing she had to go home and take three pain pills because she was in severe pain.  I was not there for the testing, so I do not know exactly what was done, but the patient alleges that she was in severe pain after the testing.
>
> . . . .
>
> BACK EXAMINATION: Reveals tenderness across the lower lumbar spine with difficulty with range of motion of her back in any plane.
>
> . . . .

21

It is my opinion that this is a long-term condition that is unlikely to improve with time and it is more likely to worsen with time.

AR at 429-31.

Dr. Pick completed his initial review of plaintiff's medical file on September 18, 2007.  He tried to speak with both Dr. Manz and Dr. Hebl before completing his initial review, but they did not respond to his contacts.  In his review, Dr. Pick noted that

[T]here are no objective basis for total impairment from gainful employment.  The medical information does not support the claimant's inability to engage in full time sedentary to light capacity work.

. . . .

[T]he subjective complaints were not objectively validated.

. . . .

Multiple doctor reports lack objective findings on the claimant's physical examination.

. . . .

A physical work performance evaluation dated 03/22/2007 to 03/23/2007 indicates embellishment and the ability to work light to medium category.

Maximum medical improvement has been reached.  There is no objective basis why she can not engage in full time sedentary to light category work.

AR at 406-07.  Dr. Pick completed an addendum to his review on October 8, 2007, after he had spoken with Dr. Hebl on October 3, 2007.  Dr. Pick noted that when he asked Dr. Hebl about the objective findings that support his belief that plaintiff was unable to work, Hebl

22

referred to plaintiff's very limited range of motion. During the conversation, Hebl stated that he did not think that plaintiff was embellishing her symptoms. Pick noted that his conversation with Dr. Hebl did not change his opinion because it "did not yield any substantive, objective medical information to validate the claimant's inability to engage in full time sedentary category [sic] work." AR at 409.

### E. Defendant's Denial of Plaintiff's Appeal

On October 22, 2007, defendant wrote plaintiff to inform her that it was upholding its determination that she did not qualify for long term disability benefits beyond March 31, 2007 because she was not "totally disabled" from her occupation as defined by the benefits plan. The five page letter included a discussion of defendant's decision, the relevant plan language, a brief summary of plaintiff's circumstances since September 2006 and the initial denial of plaintiff's benefits and the evaluation of her appeal, including a discussion of the independent medical reviews of her medical file. The letter ended by informing plaintiff of her right to bring an civil action against defendant under ERISA. Plaintiff filed this lawsuit on September 18, 2008.

### OPINION

### A. Full and Fair Review

Before discussing whether defendant's decision to terminate plaintiff's benefits was arbitrary and capricious, I must consider plaintiff's contention that defendant's notice of termination of benefits was procedurally insufficient to insure that she received a full and fair review as required under 29 U.S.C. § 1133.  In combination with 29 C.F.R. § 2560.503-1(g), § 1133 sets forth denial or termination notification requirements  to "insure that when a claimant appeals a denial to the plan administrator, he will be able to address the determinative issues and have a fair chance to present his case."  Haplin v. W.W. Grainger, Inc., 962 F.2d 685, 689 (7th Cir. 1992).

Section 1133 provides that

In accordance with regulations of the Secretary, every employee benefit plan shall--

> (1) provide adequate notice in writing to any participant or beneficiary whose claim  for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

The regulations provide more detailed information on the manner and content of the notification:

> The notification shall set forth, in a manner calculated to be understood by the claimant–
> (i) The specific reason or reasons for the adverse determination;

(ii) Reference to the specific plan provisions on which the determination is based;

(iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;

(iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

29 C.F.R. § 2560.503-1(g)(i)-(iv).

In determining whether an administrator has complied with the requirements, strict compliance is not required; "substantial compliance is sufficient." Halpin, 962 F.2d at 690. A court must consider whether "the beneficiary [was] supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." Id.

The core requirements of meaningful or full and fair review are (1) "'knowing what evidence the decision-maker relied upon,'" (2) "'having an opportunity to address the accuracy and reliability of that evidence,'" and (3) "'having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision.'" Brown v. Retirement Committee of Brings & Stratton Retirement Plan, 797 F.2d 521, 534 (7h Cir. 1986) (quoting Grossmuller v. International Union, United Automobile Aerospace & Agricultural Implement Workers of America, UAW, Local 813, 715 F.2d 853, 858 n.5 (3d

25

Cir. 1983)).  Thus, although some procedural notification defects may produce significant errors in the review process that prevent the claimant from receiving a meaningful review from the administrator, "'[e]very procedural defect will *not* upset a trustee's decision.'" Id. at 690 (quoting Wolfe v. J.C. Penney Co., 710 F.2d 388, 393 (7th Cir. 1983) (emphasis added)).

Plaintiff contends that defendant violated § 1133 because its initial March 30 notice did not provide specific reasons for termination, a description of any additional information necessary to perfect the claim or an explanation of the need for such additional information. Beginning with the first ground, plaintiff contends that the notice refers generally to the functional capacity evaluation but does not give specific reasons for the termination.  In fact, the defendant's initial termination of benefits letter does provide specific reasons although it is far from a model of compliance with the notification requirements.

In the notice, defendant informed plaintiff that she no longer qualified as disabled under the policy because the functional capacity evaluation she undertook indicated that she could perform light work.  Defendant said that a light work level was plaintiff's minimum, not maximum, work level because she had engaged in self-limiting during the evaluation. Defendant advised plaintiff that the sedentary nature of her job as a receptionist, along with the information defendant had before it, indicated to defendant that plaintiff was not totally unable to perform her job.  This was not merely general information; it was enough for

plaintiff to understand that defendant's specific reason for its termination decision was the report of the functional capacity evaluation that she could tolerate light work in an eight-hour work day.

Plaintiff believes that her claim did not receive a full and fair review because she had only a vague description and explanation of what additional information would be necessary to perfect her claim.  The notice states, "If you have any other medical information, not previously submitted, which objectively supports your disability, you may submit it for further consideration."  AR at 482.  "[A] blanket request for 'additional medical information'" does not substantially satisfy the notification requirements.  Halpin, 962 F.2d at 691.  The request must "specify *the kind* of additional medical information needed."  Id. (Emphasis added.)

Although plaintiff is correct that defendant's notice is vague, defendant specified the kind of additional medical information it needed in the June 8, 2007 letter in which it informed plaintiff that it had received her appeal.  Defendant asked for copies of her physicians' "medical records, office notes, reports, letters, summaries, etc., and the results of any diagnostic testing for treatment rendered to you from July 1, 2006 through present." AR at 459.  Although it would be desirable to identify all the required information in the denial or termination letter itself, what is most important is that "the plan participant [ ] have all the necessary information at a time when the participant still has a meaningful

27

opportunity for appeal and for full and fair review."   Schleibaum v. Kmart Corp., 153 F.3d 496, 499-500 (7th Cir. 1998) (citations omitted).

Plaintiff's June 23, 2007 letter to defendant makes it clear that she had all the information she needed to obtain a full and fair review.  She specifically disputed the functional capacity evaluation's conclusion that she had self-limited her abilities during the evaluation.  She noted that her restricted mobility made her disabled and prevented her from working.  Further, she attached all her medical records dating back to October 2004 and underlined portions and added notes to the portions that she believed to be important to her appeal.  A review of those notes shows that plaintiff focused on the pain she was suffering, her attempts to work, her inability to sit without pain and her doctor's recommendation to stop working.  She disputed the evaluation's results and she pointed out portions of her medical records that she believed objectively supported her disability.  These notes support the conclusion that plaintiff understood that defendant's decision to terminate her benefits was based on the evidence obtained through the functional capacity evaluation that she could tolerate light work.

Additionally, in its denial of plaintiff's appeal, defendant noted not only that the results of the functional capacity evaluation supported its decision to terminate plaintiff's benefits but that the additional review of plaintiff's evidence by independent doctors revealed the lack of any objective evidence in plaintiff's medical records to support her

28

contention that her back pain prevented her from tolerating a sedentary occupation.  I conclude that plaintiff received a full and fair review of the initial termination by defendant and that defendant's denial of her appeal provided her with the information she needed to prepare to bring her case in federal court.

The evidence in the administrative record supports a conclusion that defendant's notice substantially complied with ERISA's notification requirements.  The information it provided plaintiff was "adequate to ensure meaningful review of that denial."  <u>Halpin</u>, 962 F.2d at 689.  Plaintiff knew what evidence defendant relied upon (the results of the function capacity evaluation); she had an opportunity to address the accuracy and reliability of the evidence in her June 23 letter and attached medical notes; and defendant considered the evidence presented by plaintiff before it reached and rendered its final decision, as shown in defendant's letter informing plaintiff that her appeal was being denied.

Plaintiff does not contend that a better written or more detailed notice of termination would have changed the review of her claim or the evidence she would have submitted.  She submitted all her medical records, and one of the independent doctors hired by defendant to review plaintiff's records, Dr. Pick, spoke with plaintiff's treating doctor, Dr. Hebl, about what objective evidence supported the conclusion that plaintiff's back pain prevented her from working in a sedentary occupation.  Even assuming that defendant's notice had been procedurally deficient, it would be a useless formality to remand this case so that defendant

29

could provide a more detailed notice.  More detail would not alter the evidence defendant

had before it in deciding to deny plaintiff's appeal of the termination of her benefits.  E.g.,

Hancock v. Montgomery Ward Long Term Disability Trust, 787 F.2d 1302, 1308 (9th Cir.

1986) (upholding summary judgment in favor of plan when "remand merely to require the

[administrator] to send a more detailed letter would be a useless formality, accomplishing

nothing.") (internal quotation omitted)) cited with approval in Halpin, 962 F.2d at 694 n.6.


B.  Arbitrary and Capricious Standard of Review

Because the plan gives defendant discretionary authority to determine eligibility for

benefits, the parties agree that the standard of review in this case is whether defendant's

denial of benefits was an arbitrary and capricious application of the plan.  Firestone Tire and

Rubber v. Bruch, 489 U.S. 101, 115 (1989).  The deferential nature of the arbitrary and

capricious standard of review means that the court may "'consider only the evidence that was

before the administrator when it made its decision.'"  Militello v. Central States, Southeast

& Southwest Areas Pension Fund, 360 F.3d 681, 686 (7th Cir. 2004) (quoting Hess v.

Hartford Life & Accident Insurance Co., 274 F.3d 456, 462 (7th Cir. 2001)); see also

Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan, 195 F.3d 975, 981-

82 (7th Cir. 1999) ("Deferential review of an administrative decision means review on the

administrative record.").

30

"Under the arbitrary and capricious standard, the administrator's decision will only be overturned if it is 'downright unreasonable.'" Carr v. Gates Health Care Plan, 195 F.3d 292, 294 (7th Cir. 1999) (quoting Butler v. Encyclopedia Brittanica, Inc., 41 F.3d 285, 291 (7th Cir. 1994)); Hightshue v. AIG Life Insurance Co., 135 F.3d 1144, 1147 (7th Cir. 1998) (administrator's decision will be reversed only if it is "clearly unreasonable").  In other words, "[i]t is not enough that [a court] might disagree with a [administrator's] decision concerning benefits[,]" Ruiz v. Continental Casualty Co., 400 F.3d 986, 991 (7th Cir. 2005), because under the standard "[a] court will not substitute the conclusion it would have reached for the decision of the administrator, as long as the administrator makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts."  Mote v. Atena Life Insurance Co., 502 F.3d 601, 606 (7th Cir. 2007) (internal quotation omitted).  Therefore, "an administrator's decision will not be overturned if '(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem.'" Militello, 360 F.3d at 686 (quoting Hess, 274 F.3d at 461 (internal quotations omitted)).

C.  Termination of Plaintiff's Benefits

31

1.  Alleged improper weighing of evidence

Plaintiff does not disagree with defendant's interpretation of the policy that a person with the ability to perform sedentary occupational duties is not "totally disabled" as defined by the policy.  Rather, she argues that defendant was arbitrary and capricious in determining that she could perform such duties.  First, plaintiff contends that defendant failed to properly weigh the medical evidence because it disregarded the objective evidence in her medical records supporting her claim that her back pain prevents her from tolerating any sedentary occupation.

Plaintiff's medical records contain little more than her subjective symptoms and complaints about back pain.  None of plaintiff's x-rays have shown any visible problems from the back surgery.  When she began to report increased back pain in 2005 and reported a continued increase until she stopped working in June 2006, Dr. Manz did not test or evaluate plaintiff in any way to determine the functional limitation of her back pain.  In no examination of plaintiff did Dr. Manz note any problems, failures or other objective physical complications other than plaintiff's complaints of pain, her reported tenderness upon touch and her limited range of motion, based on her reported pain levels.  Instead, he accepted as true plaintiff's subjective complaints of pain and her statements that she was unable to work.  Further, although Manz told plaintiff to stop working until she was examined by Dr. Hebl, there is no evidence that Manz believed that plaintiff's back pain prevented her from

32

working at her sedentary occupation.  His records include suggestions that plaintiff try part-time work or other compromises at work to help with any pain, but he never said that she was unable to work altogether, as is required to be considered "totally disabled" under the policy.

Dr. Hebl also did not test or evaluate plaintiff in any way to determine the functional limitation her back pain placed on her.  He noted that her flexion or range of motion was limited because of her reported pain.  He also noted her subjective complaints of pain and her report of how the pain affected her ability to work.  It is true that the amount of pain an individual experiences is "inherently subjective in nature" and that failure to provide objective evidence of the amount of pain experienced cannot be a reason for denying benefits.  Williams v. Aetna Life Insurance Co., 509 F.3d 317, 323 (7th Cir. 2007).  However, "how much an individual's degree of pain [ ] limits [her] functional capabilities [ ] can be objectively measured."  Id. at 322.  Dr. Manz reported that plaintiff's ability to work was limited by her back pain and Dr. Hebl said that plaintiff could never return to work because of her back pain, but neither provided specific data or evaluation results supporting these functional limitations.  Defendant does not deny that plaintiff's back caused her pain.  It does deny that plaintiff submitted objective medical evidence to support her contention that the pain prevented her from working at her sedentary occupation.

It was not unreasonable for defendant to determine that the objective results of the

33

functional capacity evaluation carried more weight than plaintiff's subjective complaints of pain and her doctors' acceptance of those reports.  This determination supported the conclusion that plaintiff could tolerate light work during an eight-hour work day, which included sitting for 1/3 to 2/3 of the time.  It was not clearly unreasonable for defendant to favor objective evidence over subjective complaints and opinions.

Additionally, plaintiff contends that defendant failed to explain why it gave more weight to the functional capacity evaluation results and its hired independent doctors' opinions than plaintiff's medical records.  In the initial termination defendant provided its specific reason, the evaluation's results, for why plaintiff's benefits were being terminated. In the denial of plaintiff's appeal it further explained that beside the evaluation results, a review of plaintiff's medical records established a lack of objective medical evidence to support her claim.  Defendant noted that plaintiff's doctors had accepted her subjective symptoms and complaints without evaluating how her back pain limited her functionality at work.  Defendant was not required to provide a further detailed explanation of its reasons.

2.  Alleged unreasonableness of defendant's reliance on results of functional capacity evaluation

Plaintiff contends that defendant erred not only in its weighing of the evidence but in giving any weight at all to the results of the functional capacity evaluation.  Although this

34

argument overlaps the preceding one, here plaintiff focuses on the specifics of the evaluation. She says that the sitting portion of the evaluation lasted only five minutes and that from that portion, the evaluator determined that plaintiff could tolerate a job requiring sitting for 1/3 to 2/3 of an eight-hour work day.

In fact, the evaluation results were based on more than the sitting test alone.  The evaluation tested dynamic strength, position tolerance and mobility tasks.  Taking the results from all the individual tasks or tests produced the overall conclusion that plaintiff could engage in light work.  The briefness of the sitting portion does not undermine the reliability of the conclusion because the evaluation of plaintiff's tolerance for sitting was not based solely on the sitting test.

Plaintiff challenges the conclusion that she self-limited or provided inconsistent effort and behavior.  She contends that the evaluation's rate of error or underlying reasoning is unknown and that its results are therefore unreliable.  Although the evaluation does not specify rate of error information, the evaluator noted that the reliability and validity of the testing procedures and conclusions are supported by research performed at the University of Alabama at Birmingham and reported in the Journal of Occupational Medicine, Sept. 1994.  AR at 76.  Plaintiff does not challenge the reliability or validity of this underlying research.

The evaluator explained the determination of self-limiting and its cause:  self-limiting

35

on 20% of the tests is normal for motivated participants and such limitation can be associated with pain. However, self-limiting on 33% or more of the tests significantly exceeds normal self-limiting and is associated with psychosocial and motivational factors.

Plaintiff contends further that the results were inconsistent and thus not reliable. She points to the conclusion that her pain behaviors on the mobility and endurance testing were consistent with her self-reported pain and her observed movement patterns. When read in full however, the report makes it clear that those consistencies were considered and outweighed by her inconsistent and self-limiting behaviors. The evaluator never stated that plaintiff did not suffer any pain; she stated only that any pain plaintiff had would not prevent her from tolerating light work. Although plaintiff's challenges to the evaluation might persuade someone else not to give as much weight to the evaluation's results as defendant did, they do not show that defendant's conclusion was clearly unreasonable. E.g., Sisto v. Ameritech Sickness and Accident Disability Benefit Plan, 429 F.3d 698, 701 (7th Cir. 2005) ("Raising debatable points does not entitle Sisto to a reversal under the arbitrary-and-capricious standard.").

3.   Allegedly improper use of evaluation results

Plaintiff points to the fact that the evaluator relied on the evaluation results to conclude that plaintiff could sit for 1/3 to 2/3 of an eight-hour work day, whereas plaintiff's

36

job description required sitting for 67-100% of the day.  This difference is immaterial because whether plaintiff was totally disabled under the policy was dependent on whether she could perform the material duties of any sedentary occupation, which the evaluation results said she could, not whether she could perform the duties of her actual job.  Moreover, she does not mention that the evaluator noted that plaintiff's self-limiting showed the *minimum* level of work she could tolerate, which meant that it was possible she could tolerate a greater level of work.  It was not "downright unreasonable" to infer from this information that plaintiff could possibly do more than what the results provided.  E.g., Blickenstaff v. R.R. Donnelly & Sons Co. Short Term Disability Plan, 378 F.3d 669, 678-79 (7th Cir. 2004) ("Notably, the February exam indicates that Blickenstaff did not put forth her best effort during testing, leading to a reasonable inference that she could perform even more work than that expressed by the February exam.").

Plaintiff challenges defendant's decision to accept the opinions of the doctors that independently reviewed plaintiff's medical records over her treating doctors' opinions, contending that it is clearly unreasonable to accept the opinions of doctors that merely performed file reviews over the opinions of doctors that actually examined plaintiff.  To the contrary, reliance on such opinions is not necessarily unreasonable.  Leger v. Tribune Co. Long Term Disability Benefit Plan, 557 F.3d 823, 832 (7th Cir. 2009).

The Court of Appeals for the Seventh Circuit has explained

37

> ERISA does not require plan administrators to accord special deference to the opinions of treating physicians.   Further, courts may not impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.  We also have recognized that most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk).

Mote, 502 F.3d at 607 (internal quotations and alterations omitted).  In this case, both reviewing doctors were board certified doctors, qualified to review plaintiff's records.  They reviewed plaintiff's entire medical records dating back to October 2004 and the functional capacity evaluation results and found no objective medical information to validate her inability to engage in full time sedentary work.  The administrative record contains no evidence supportive of plaintiff's contention that the reviewing doctors' opinions are not credible.  Defendant has a duty to consider opinions other than those of treating physicians because it must consider the possibility that treating physicians are more likely to accept the claimant's complaints as true, even though there may be some exaggeration.  E.g., Mote, 502 F.3d at 608 ("ERISA 'plan administrators have a duty to all beneficiaries and participants to investigate claims and make sure to avoid paying benefits to claimants who are not entitled to receive them.'") (quoting Davis v. Unum Life Insurance Co. of America, 44 F.3d 569, 575 (7th Cir. 2006)).  Accordingly, defendant was not clearly unreasonable in relying on the opinions of independent doctors.

38

Citing statements by a court in another case, plaintiff challenges Dr. Pick's credibility, contending that he had a severe conflict of interest and bias. However, this record contains no evidence that Dr. Pick had an incentive to support a position that would uphold the denial of plaintiff's benefits. His determination that objective medical evidence was lacking aligns with plaintiff's medical records. The mere fact that Pick is often hired to do medical reviews by companies like defendant does not show that he has a conflict of interest or that he is biased as a matter of law. The outcome in any one ERISA case does not hurt an insurer's bottom line. Thus, unless the particular circumstances are suspect, there is no reason to believe that Dr. Pick had an incentive to reach his opinion. Mote, 502 F.3d at 608 (citing Leipzig v. AIG Life Insurance Co., 362 F.3d 406, 409 (7th Cir. 2004)).

4. Defendant's alleged conflict of interest

Finally, plaintiff raises the conflict of interest defendant would have as an administrator of benefits responsible for determining eligibility for benefits as well as paying them out. As plaintiff correctly points out, such a conflict of interest is a "factor" in determining whether a denial of benefits was arbitrary and capricious. Metropolitan Life Insurance Co. v. Glenn, 128 S. Ct. 2343, 2350 (2008). As the Court noted in Metropolitan Life, 128 S. Ct. at 2351, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's

inherent or case-specific importance."

Plaintiff fails to explain the importance that the conflict of interest factor should hold in this case.  Instead, plaintiff merely quotes large portions from <u>Metropolitan Life</u>.  Plt.'s Br., dkt. #15, 19-20.  The only fact-specific point plaintiff makes is her conclusory allegation that Dr. Pick is biased.  Plaintiff's argument is undeveloped, which means that it is waived.  <u>Kramer v. Banc of America Securities, LLC</u>, 355 F.3d 961, 964 n.1 (7th Cir. 2004).  However, even if I consider it, it adds little weight to a conflict of interest factor.  I have already discussed the fact that the evidence does not support such a bias.  Further, defendant relied on more than just Dr. Pick's opinion; in fact, defendant did not rely on Dr. Pick's opinion at all in its initial decision to terminate plaintiff's benefits.  Defendant sought independent expert advice from Gupta as well as Pick, both of whom are qualified experts and reviewed all plaintiff's medical records, as well as an independent functional capacity evaluation.  Defendant's efforts amount to a thorough investigation.  <u>Hightshue</u>, 135 F.3d at 1148.  Plaintiff's conflict of interest allegation does not weigh in favor of a finding that defendant's decision was arbitrary and capricious.

In conclusion, defendant weighed the functional capacity evaluation results and the opinions of two independent doctors against plaintiff's subjective complaints and one treating doctor's opinion that plaintiff's pain prevented her from working and another treating doctor's opinion that plaintiff's pain limited her to part-time work.  Defendant was

40

not clearly unreasonable in determining that plaintiff's subjective complaints of pain did not outweigh the functional capacity evaluation results that she could tolerate light work, which included sedentary work.  Defendant's decision was the result of a rational process and reasonable in light of the evidence in the administrative record.

Although many of the issues raised by plaintiff address debatable points regarding defendant's decision, they do not entitle plaintiff to a reversal of defendant's decision.  Sisto, 429 F.3d at 701.  The issue is not whether defendant's decision was correct or whether it was the same one I would reach, but whether defendant's decision was unreasonable.  It was not.  Davis, 44 F.3d at 576-77 ("The judicial task here is not to determine if the administrator's decision is correct, but only if it is reasonable.").  Accordingly, plaintiff's motion for summary judgment will be denied and defendant's will be granted.

ORDER

IT IS ORDERED that plaintiff Christina Schreiner's motion for summary judgment, dkt. #14, is DENIED and defendant United Wisconsin Insurance Company d/b/a United Wisconsin Group's motion for summary judgment, dkt. #22, is GRANTED; the clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 15th day of June, 2009.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

42